**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| ANITA MARIE JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:16-cv-00952-NKL |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Anita Marie Johnson appeals the Commissioner of Social Security's final decision denying her application for disability and disability insurance benefits under the Social Security Act. The decision is reversed and remanded for further proceedings.

## I.     Background

Johnson was born in 1956. She worked for an auto auction from 2000 until 12/7/2011, when she alleges she became disabled. The Administrative Law Judge held a hearing on 3/4/2015 and denied her application on 5/22/2015, and the Appeals Council denied her request for review on 8/1/2016. Johnson's date last insured was 12/31/2016, so she must establish disability on or before that date to qualify for benefits. In this appeal, Johnson argues that the ALJ's conclusions at Steps 2 and 4 of the sequential analysis were unsupported.

### A.     Mental health history

Johnson was treated through Tri-County Mental Health Services from September 2008 through February 2010, where she was seen by Shahbaz Khan, M.D., a psychiatrist, and counselors. She discontinued treatment and was discharged from care as "moderately improved"

with a diagnosis of "Bipolar II." Tr. 256. At the time of discharge, she was taking Lamictal, Abilify, and Wellbutrin, and was noted to be medication compliant. *Id.*

In May 2014, Johnson established care with Khursheed Zia, M.D., a psychiatrist, whom she continued to see through March 2015. At her initial evaluation, Johnson reported that she had been getting mental health services "all her life and been given different diagnoses[,]" and had "been depressed for the last 45 years." Tr. 324. She said she had been off of her psychiatric medications for a long time and that some of the medications made her catatonic. She reported three suicide attempts and having been abused in the past, that she experienced symptoms of depression every day, and that a demon lived inside her who wanted to kill her. *Id.* Dr. Zia noted that Johnson was cooperative, her behavior was unremarkable, her memory was intact, and she had fair judgment and insight, logical thought processes, and realistic self-perception. Tr. 319. However, she was struggling with depression, anxiety, and anger problems, and appeared "a little delusional[.]" *Id.* He diagnosed Johnson with major depression, recurrent, chronic, and personality disorder not otherwise specified, and prescribed Risperdal, Celexa, and Klonopin. Tr. 319. In August 2014, Johnson was not doing well and reported that she had called the crisis line because she did not want to commit suicide. Her mood was irritable and depressed. Dr. Zia added lithium to her medications. In January 2015, the doctor diagnosed Johnson with recurrent depressive psychosis, personality disorder not otherwise specified, alcohol abuse, and pathological gambling, and renewed her prescriptions for lithium, Celexa, and Klonopin. Tr. 396. In March 2015, the doctor renewed Johnson's prescriptions and listed the same diagnoses as in January 2105, but noted that her alcohol abuse and pathological gambling were improved.

Johnson saw a counselor, Randell Wilson, from March 2014 through February 2015. In June 2014, she told Wilson that she needed disability because she could not work around a lot of people and still be able to function. Tr. 316. In February 2015, she told Wilson that she was doing better, but having some anxiety due to an approaching disability hearing.

In January 2016, after the ALJ's decision in this case, Johnson saw a social worker, Shannon Johnston, LCSW. Johnson said she was returning for services due to major depressive disorder based on multiple factors including health problems, difficulty working, and failed disability attempts, and that she had been hearing demons saying "hateful" things to her, such as calling her a failure. Tr. 28. She said she had had three, psychiatric hospitalizations in the past but that they were not for suicide attempts. Her father had died six months earlier and she was grieving. She worried about homelessness, and lack of insurance and finances. She was not having problems with alcohol or gambling. She complained of low back and shoulder pain. The counselor's Assessment was major depressive disorder, recurrent, in remission, unspecified, chronic; alcohol abuse, uncomplicated, improved; pathological gambling, improved; and personality disorder, unspecified symptoms. Tr. 30-31. The counselor noted that Johnson needed a psychiatric evaluation.

**B.      Medical history**

Johnson had a heart attack in October 2011. She was diagnosed with ischemic heart disease, treated with stents and medications, and encouraged to stop smoking and participate in cardiac rehabilitation. At a follow-up visit with her cardiologist in November 2011, Johnson was doing well from a cardiac standpoint. However, she was emotionally stressed and upset about returning to work "too early," explaining that she had a coworker who created a lot of stress and anxiety for her. Tr. 284. She denied any physical reasons for being unable to return to work. *Id.*

In November 2014, Johnson saw Sherry Howell, D.O., about diabetes, arthralgias, and hypertension. Johnson said she had been off her diabetes medications, glyburide and Novolog, for a year. She said she had pain that radiated from the spine to the hips, joint tenderness, and numbness and tingling in the legs. She said that her hips and low back ached after standing and bending, her shoulders and neck hurt after working overhead, and that she spent much of the day in bed due to pain. Tr. 382. In assessing range of joint motion on musculoskeletal exam, the doctor noted "mild pain" with motion. Tr. 386. Gait was normal and a scour test of both hips

was negative.[1]  *Id.*  Johnson had "inappropriate mood and affect" but was oriented.  *Id.*  Dr. Howell assessed chronic neck, low back, and hip pain, and ordered x-rays and a blood test for rheumatoid factor.  The doctor also assessed chronic diabetes mellitus, uncontrolled, and chronic coronary artery disease. The hip x-rays showed mild, degenerative findings.  Tr. 400.

Johnson saw Dr. Howell for follow up on 1/5/2015.  On physical exam, the doctor noted that "all extremities move well without deficits" and that Johnson had normal gait.  Tr. 393.  The doctor did not prescribe any medications, other treatments, or tests for Johnson's neck, back, or hips. Tr. 394.

On 3/9/2016, Johnson saw Daniel Purdom, M.D., for diabetes and abdominal pain.  The doctor noted abdominal tenderness on exam.  His Assessment was low back pain, hypertension, and Type 2 diabetes mellitus with hyperglycemia. He prescribed ibuprofen for the back pain, and aspirin, Crestor, cyclobenzaprine, and Lisinopril.  Johnson next saw Dr. Purdom on 4/28/2016, for diabetes, body aches, arthritis, headaches, and back pain.  Her diabetes was noted to be stable and she was compliant with her medication, but complained of chest pain, diarrhea, fatigue, weight gain, foot ulcers, and heartburn.  On musculoskeletal exam, the doctor noted right shoulder tenderness and reduced range of motion, and right hip tenderness with moderate pain upon motion. Scoring of a questionnaire that Johnson filled out rated her as having mild depression. The Assessment was unspecified hip pain, Type 2 diabetes mellitus without complication, and bilateral shoulder pain.  The doctor ordered labs and prescribed Crestor and cyclobenzaprine.  Johnson already had an active prescription for Klonopin.  Lab results dated 5/9/2016 showed a slightly elevated rheumatoid factor but a negative screen for antibodies associated with autoimmune diseases.

---

[1]     A negative scour test suggests that there is no defect in the articular cartilage of the hip.  http://medical-dictionary.thefreedictionary.com/hip+scouring+test.

## C.    Expert opinions

On 9/12/13, Nina Epperson, M.S., performed a psychological evaluation, including cognition testing. Tr. 299-300.  Mental status exam revealed fair hygiene, fair eye contact, irritability, tangential thought with content focused on an incident with a coworker at a previous job, depressed mood, irritable affect, trouble falling and staying asleep, average range of intelligence, and intact insight and judgment.  Diagnoses were mood disorder NOS, rule out personality disorder, and GAF 55.  Epperson opined that Johnson was able to understand and remember simple instructions, sustain concentration and persist with routine tasks, and manage funds in her best interest, but had mild impairment regarding her interpersonal skills and difficulty adapting to changes in her environment.  Johnson preferred to work alone due to issues with irritability and anger.  The ALJ gave Epperson's opinions "partial" weight.  Tr. 61.

Kala Danushkodi, M.D., a board certified physical medicine and rehabilitation specialist, evaluated Johnson on 9/17/13.  Tr. 303-307.  Her chief complaints were low back pain, neck pain, depression, and bipolar disorder.  She reported that she sustained a violent sexual encounter between 1988-1990 which resulted in torn neck muscles and other physical injuries. She complained of intermittent pain in her neck and low back, and that she was unable to sit, stand, or walk for prolonged periods of time; of tingling and numbness in her hands and feet; and of migraine headaches that left her bedbound at least once a month.  She reported difficulty coping with stress and pain, which was aggravated by emotional issues, and frequent crying episodes and high anxiety, with symptoms related to PTSD.  She was able to perform light household chores.  She smoked less than a pack per day.  Medications included Ativan, glyburide, aspirin, and vitamins.  Physical examination revealed positive Tinel's sign in the left wrist, diminished sensation in the fingertips, flattening of lumbar lordosis, mild tenderness of the lower sacrum, negative straight leg raising, normal range of motion in all extremities, normal gait, ability to

heel and toe walk without difficulty, normal lumbar flexion and extension, good strength in the upper and lower extremities, normal grip strength, and ability to squat without support. Impressions included low back pain, bipolar disorder, depression and anxiety. Dr. Danushkodi opined that there were no sitting restrictions, and that Johnson could stand and walk with periodic rest breaks, and lift up to 20 pounds. The doctor recommended obtaining a disability opinion from a psychiatrist. The ALJ gave Dr. Danushkodi's opinions "partial" weight. Tr. 62.

Stanley Hutson, Ph.D., prepared a Psychiatric Review Technique assessment on 10/4/2013. Tr. 88-94. Hutson opined that Johnson had mild restriction of activities of daily living, moderate difficulties maintaining social functioning, and mild difficulties maintaining concentration, persistence, or pace. He further opined that Johnson had moderate difficulties maintaining attention and concentration for extended periods, working in coordination with or proximity to others without being distracted by them, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without distracting them or exhibiting behavioral extremes, and responding appropriately to changes in the work place. Hutson noted that Johnson was distracted by people and may have some difficulty with attention and concentration; would benefit from limited social demands; has some difficulty coping with work conflict and demands; has been able to adapt in the past in a low stress work setting; and could understand and follow instructions. He also noted that Johnson had taken college courses in 2013.

A vocational expert, Alissa Smith, testified at the hearing before the ALJ and stated that her opinion was consistent with the Dictionary of Occupational Titles. Smith classified Johnson's past relevant work as follows: security guard, DOT 372.667-038, specific vocational preparation (SVP) level 3, semi-skilled, light exertional level as classified but actually performed by Johnson as medium; driver, DOT 913.663-018, SVP level 3, semi-skilled, classified as medium exertional

level but actually performed by Johnson as light; and final inspector, DOT 806.678-018, SVP level 4, semi-skilled, light. Smith added that Johnson's part-time work as a cleaner would be classified as a housekeeper, DOT 323.687-014, SVP level 2, light. The ALJ asked Smith about a hypothetical claimant of Johnson's age, education, training, and work experience, and who could do light work, lift and carry 20 and ten pounds, and stand and walk for six of eight hours, but who could not perform work involving intense interpersonal relationships. Smith testified that the individual could perform Johnson's past work as a final inspector. However, if the individual was limited to sedentary work, she could not perform any past work. If the individual had to take frequent, unscheduled breaks due to health problems, then no competitive work would be available.

### D. Johnson's reports and hearing testimony

In her adult function report dated 9/20/2013, Johnson stated that on a good day she would get up, have breakfast, go for a short walk to the library to look for a job, and go through her boxes of "stuff." Tr. 220. On a bad day, she might have to take pain medications and would try to stay focused. She stated that she could not stand or sit more than ten minutes at a time, it took her a long time to perform personal care and household chores, and she needed reminders and encouragement. She could go out and shop on her own, but sometimes took someone with her in case of panic or anxiety. She was not responsible with money. She read daily, made jewelry, and sometimes visited friends at their houses. She stated that she had arthritis and could not lift anything more than ten or 15 pounds. Repeated lifting caused "pain, headache, migraine." Tr. 225. She could walk a half mile before having to rest about 15 to 30 minutes, and was "trying to build up" her "stamina." *Id.* She could pay attention for ten to 15 minutes, follow written instructions well, and follow spoken instructions depending on the nature of the instructions. *Id.* She was "force[d]" to retire from the auto auction due to a negative manager whom "no one could get along" with. Tr. 226. She stated she could not handle any "neg.

stress." *Id.* She included a list of traumatic events that had happened throughout her life, to herself and family members. Tr. 232.

At the March 2015 hearing before the ALJ, Johnson testified that she graduated from high school, and had taken two years of college courses funded by Vocational Rehabilitation. At the time of the hearing, she was working 20 hours per week doing office cleaning, a job she had started in December 2013. She worked five nights per week, in four-hour shifts. From 2000 to 2011, Johnson worked for the Kansas City Auto Auction, where she did vehicle registration, then worked as a driver, and then worked in the security department.

Johnson testified that when she gets up in the morning, she makes coffee, may do dishes or laundry and then go back to bed for a couple of hours, then gets up for a couple of hours, cooks dinner, and goes to work. She can drive but cannot afford a car. She testified that she cannot work full time now because of pain that she experiences in her hips and neck. She stated that she has pain when reaching overhead, walking upstairs, walking more than one block and back, lifting more than ten pounds, sitting for more than 20 minutes, or from migraine brought on by lifting.

Johnson further testified that because of her 2011 heart attack, she takes baby aspirin daily. She has problems with anxiety when she goes out, but can grocery shop with a companion or go to self-service stores or the library, and takes Lithium, Clonazepam, and Klonopin. She said that she has uncontrolled, type 2 diabetes. When her blood glucose is low she gets sweaty and faint. At the time of the hearing, her doctor had prescribed a new medication for her diabetes. She has not tested her blood glucose at work and did not know if her diabetes caused other symptoms. She also testified that she has a history of bilateral carpal tunnel surgery. She said she sometimes has weakness in the hands, and the left hand will sometimes "draw up in a claw." Doc. 79. She does "physical therapy[,] self-prescribed." *Id.*

### E.    The ALJ's decision

The ALJ found that during the relevant period, Johnson had severe impairments of bipolar disorder and "neck/back pain/degenerative disk disease." Tr. 56. Johnson did not claim to meet any Listings, and the ALJ did not find that she met any.

The ALJ found that Johnson has the residual functional capacity to perform:

> [T]he full range of light work as defined in 20 CFR 404.1567(b) except that the claimant cannot have intense personal relationships.

Tr. 58. The ALJ concluded that Johnson was capable of performing past relevant work as a final inspector, DOT 806.687-018, SVP level 4, semi-skilled, light, Tr. 63, and denied benefits.

## II.    Discussion

Johnson argues that reversal and remand for award of benefits is necessary because the ALJ failed to identify hip pain, ischemic heart disease, uncontrolled diabetes, and carpal tunnel syndrome as severe impairments at Step 2 of the sequential analysis. She further argues that in determining the RFC at Step 4, the ALJ failed to properly weigh the medical opinion evidence, perform a function-by-function analysis, or factor in hip pain and ischemic heart disease. Finally, Johnson argues that the ALJ improperly found that she could perform past relevant work as a final inspector, DOT 806.678-01. As discussed below, Johnson's arguments concerning Steps 2, and RFC at Step 4, fail but that reversal and remand for further proceedings is necessary with respect to the ALJ's determination concerning ability to do past relevant work.

The Court's review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015). Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Id*. The Court must consider evidence that both supports and detracts from the Commissioner's decision but cannot reverse the decision because substantial evidence also exists

in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015).  If the Court finds that the evidence supports two inconsistent positions and one of those positions represents the Commissioner's findings, then the Commissioner's decision must be affirmed.  *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015).

A.      **The Step 2 determination**

Johnson argues that reversal is necessary because the ALJ failed at Step 2 to identify several impairments that are severe:  hip pain, ischemic heart disease, uncontrolled diabetes, and carpal tunnel syndrome.  The argument fails.

To demonstrate severe impairment at Step 2, a claimant must demonstrate that the impairment is medically determinable and more than minimally affects her ability to perform work-related functions.  *Kirby v. Astrue,* 500 F.3d 705, 707 (8th Cir. 2007); 20 C.F.R. § 404.1251.  The ALJ expressly recognized Johnson's report of arthralgia in the hips, but noted that imaging performed in November 2014 showed only mild degenerative changes.  The rest of the medical record is consistent with the ALJ's decision to find no severe impairment of hip pain. A physical exam performed in September 2013 showed that Johnson had normal range of motion of the hips and could squat without difficulty, and had normal gait.  She in fact started working as an office cleaner a few months later, in December 2013.  A physical exam in January 2015 showed that "all extremities move[d] well without deficits" and that Johnson had normal gait, Tr. 393, and no medications or other treatments were prescribed for Johnson's hips. At an exam in April 2016, the doctor noted right hip tenderness and moderate pain on motion. The diagnosis was unspecified hip pain, but the doctor did not prescribe medication or any other treatment, and did not order any tests.  Overall, the medical record in fact shows very few doctor visits, and that Johnson was never prescribed medication stronger than ibuprofen for pain, when

she was prescribed pain medication at all.

The ALJ also noted Johnson's 2011 diagnosis of ischemic heart disease and hospitalization, but that she had been treated and discharged as stable, denied any unstable symptoms after the episode and returned to work, that she continues to smoke, and that she does not receive any ongoing treatment after the incident, apart from taking baby aspirin daily.

Further, Johnson's medical records do not reflect ongoing treatment relating to carpal tunnel syndrome. She points out that in September 2013, she had a positive Tinel's sign, or tingling sensation, in the left wrist on exam, and diminished sensation in the fingertips, but she has not demonstrated how the findings relate to more than minimal difficulty in performing work functions. As noted, she in fact began doing office cleaning work at the end of December. She testified that she sometimes experiences weakness in the wrists and that the left hand sometimes draws up like a claw, but her physical examinations performed in September 2013, as well as in January 2015, showed normal grip strength and no difficulties in moving her extremities, and her medical records reflect no complaints that her left hand draws up.

Johnson testified that she might feel sweaty and faint if her blood glucose was too low, but did not testify how frequently it happened, or that it ever caused her difficulty working. She said she has never tested her blood glucose at work, and that her doctor had recently started a new diabetes medication.

Johnson failed to carry her burden of demonstrating that hip pain, ischemic heart disease, uncontrolled diabetes, or carpal tunnel syndrome were severe impairments at Step 2, and substantial evidence supports the exclusion of such impairments at that step. Therefore, the ALJ's findings with respect to severe impairments will not be disturbed.

### B. The RFC determination

#### 1. Weight given the opinion evidence

Johnson argues that the ALJ did not properly weigh the opinions of three experts, Nina Epperson, Dr. Danushkodi, and Dr. Hutson, and that the RFC is therefore not properly supported by medical evidence. She adds that the ALJ erroneously gave significant weight to the Single Decision Maker, and reversal is therefore necessary. The arguments fail.

Residual functional capacity is what a claimant can still do despite physical or mental limitations. 20 C.F.R. § 404.1545(a); *Masters v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); Social Security Ruling 96-8p, 1996 WL 374184, *5 (July 2, 1996). An ALJ must formulate the RFC based on all of the relevant, credible evidence of record. *See Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) ("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.") (*quoting Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)). The RFC determination must be supported by substantial evidence, including at least some medical evidence. *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000). Evidence relevant to the RFC determination includes medical records, observations of treating physicians and others, and a claimant's own description of her limitations. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000) (citation omitted). The claimant has the burden to prove her RFC. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).

Factors considered in weighing medical opinion evidence include the length of the treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability of the opinion including medical signs and laboratory findings, consistency with the record as a whole, specialization of the medical source, and other factors such as the source's understanding of the disability programs. 20 C.F.R. § 404.1527; 20 C.F.R.

§ 404.927. The opinion of a consulting examiner may be considered "in determining the nature and severity of a claimant's impairment." *Charles v. Barnhart,* 375 F.3d 777, 783 (8th Cir. 2004) (*citing Harris v. Barnhart,* 356 F.3d 926, 931 (8th Cir. 2004), and 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)). The opinion of a non-examining, state agency consultant is also considered and may be given greater weight than the opinions of treating or examining sources. 20 C.F.R. § 404.1527(c); SSR 96-6p, 1996 WL 374180, at *1 and 3 (July 2, 1996). An ALJ may even determine a claimant's RFC without a specific medical opinion, if there is sufficient medical evidence in the record. *Stallings v. Colvin,* 2015 WL 1781407 (W.D. Mo. 2015).

### a. Nina Epperson, M.S.

Epperson performed a psychological evaluation in September 2013, which the ALJ gave only partial weight. Johnson argues, and Commissioner Berryhill agrees, that the ALJ incorrectly held Epperson, a licensed psychologist, was not an acceptable medical source. *See* 20 C.F.R. 404.1513(a)(2) (acceptable medical sources include licensed psychologists). However, the ALJ's decision to give the opinion partial weight is supported by substantial evidence on the whole record, and Johnson cannot demonstrate prejudice in any event.

The mental status exam that Epperson performed revealed fair hygiene, fair eye contact, irritability, tangential thought with content focused on an incident with a coworker at a previous job, depressed mood, irritable affect, trouble falling and staying asleep, average range of intelligence, and intact insight and judgment. Diagnoses were mood disorder not otherwise specified, rule out personality disorder, and GAF 55. Tr. 300. Epperson opined that Johnson was able to understand and remember simple instructions, sustain concentration and persist with routine tasks, and manage funds in her best interest, but had mild impairment regarding her interpersonal skills and difficulty adapting to changes in her environment. She noted that

Johnson preferred to work alone due to issues with irritability and anger. In giving the opinion partial weight, the ALJ stated that the social restrictions were supported, but that the record did not support limiting Johnson to simple instructions. Tr. 61. The ALJ explained that a limitation on intense, personal relationships would account for Johnson's irritability and issues in interacting with others. *Id.* The ALJ then added that as a licensed psychologist, Epperson was not an acceptable medical source. *Id.*

Johnson argues that the ALJ should have given more weight to Epperson's opinion that Johnson could understand and remember no more than simple instructions, and therefore limit her RFC to routine tasks with no changes in the work environment. However, Epperson's evaluation does not provide support for such a limitation, nor is it consistent with the record. A May 2014 evaluation performed by Johnson's psychiatrist, Dr. Zia, eight months after the one performed by Epperson, reflects that Johnson's memory was intact, and that she had fair judgment and insight, and logical thought processes. In June 2014, Johnson told her counselor that she needed disability because she could not work around a lot of people, not that she had difficulty with more than simple instructions. At the March 2015 hearing before the ALJ, Johnson did not identify any difficulty with understanding and remembering more than simple instructions. In fact, when asked at the hearing what prevented her from working full time, Johnson identified no mental issues, only physical ones. Substantial evidence on the whole record supports the ALJ's decision to give Epperson's opinion only partial weight.

Furthermore, Johnson cannot demonstrate that the ALJ's conclusion resulted in any prejudice. As noted above, the ALJ first explained that the record did not support the limitation Epperson identified. The ALJ's additional and erroneous holding that Epperson was not an acceptable medical source did not affect the outcome. Therefore, it does not merit reversal. *See Pfizer v. Apfel,* 169 F.3d 566, 569 (8th Cir. 1999) (an error in opinion-writing does not support

reversal if the error has no effect on the outcome) (citing *McGinnis v. Chater,* 74 F.3d 873, 875 (8th Cir. 1996)).

### b. Dr. Danushkodi

Johnson argues that the ALJ should not have rejected Dr. Danushkodi's opinion that she needed periodic rest breaks in relation to standing and walking. She further argues that the ALJ should have accounted for the doctor's finding on physical exam of a positive Tinel's sign and diminished sensation in the fingertips, even though the doctor "did not address any limitations as to [these] findings[.]" Doc. 18, p. 20. The arguments fail.

When Dr. Danushkodi, a board certified physical medicine and rehabilitation specialist, evaluated Johnson in September 2013 her chief complaints were low back pain, neck pain, depression, and bipolar disorder. She reported having intermittent pain in her neck and low back and that she was unable to sit, stand, or walk for prolonged periods of time; had tingling and numbness in her hands and feet; and at least once a month had a migraine and was bedbound. She admitted that she could perform light household chores. She reported difficulty coping with stress and pain, and that she had frequent crying episodes and high anxiety, and symptoms related to PTSD. Physical examination revealed positive Tinel's sign in the left wrist; diminished sensation in the fingertips; flattening of lumbar lordosis; mild tenderness of the lower sacrum; negative straight leg raise; normal range of motion in all extremities; normal gait; ability to heel and toe walk without difficulty; normal lumbar flexion and extension; good strength in the upper and lower extremities; normal grip strength; and the ability to squat without support. Dr. Danushkodi's impressions included low back pain, bipolar disorder, depression, and anxiety. He opined that there were no sitting restrictions, and that Johnson could stand and walk with periodic rest breaks, and lift up to 20 pounds. He recommended obtaining a disability opinion from a psychiatrist.

The ALJ gave Dr. Danushkodi's opinion partial weight, explaining that the doctor did not provide a residual functional capacity with respect to standing and walking, or explain why periodic rest breaks were required given the unremarkable physical findings. The ALJ's decision is supported by substantial evidence on the whole record. Although Johnson reported problems with standing and walking for prolonged periods, almost all of the doctor's physical exam findings relating to Johnson's ability to stand and walk were unremarkable. Although doctor did note a flattening of lumbar lordosis and mild tenderness of the lower sacrum, he did not explain how such findings were related to standing, walking, and a need for rest breaks. The record also shows that after September 2013, when Dr. Danushkodi performed his evaluation, Johnson was able to begin working part time as an office cleaner, and that overall, she had very few doctor visits, physical exams showed normal or mild findings, and she was never prescribed medication stronger than ibuprofen for pain, when she was prescribed pain medication at all. The ALJ nonetheless gave Johnson the benefit of any doubt by accommodating her complaint of back pain with a limitation to light work.

Johnson also states that "the ALJ did not account for and Dr. Danushkodi did not address any limitations as to his own findings" of a positive Tinel's sign in the left wrist and diminished sensation in the fingertips, and the ALJ's decision is therefore "unsupported by Dr. Danushkodi's opinions". Doc. 18, p. 20. The doctor performed the consultative exam for the purpose of identifying limitations. That he did not find limitations related to the positive Tinel's sign and diminished sensation in the fingertips is consistent with the conclusion that such findings simply were mild and not significant. Johnson does not even suggest what the limitations would be. Johnson's argument therefore fails.

Substantial evidence on the whole record supports the ALJ's decision to give Dr. Danushkodi's opinion partial weight.

### c.    Dr. Hutson

Johnson argues that the decision must be reversed because the ALJ failed to state how much weight he gave the opinion of Dr. Hutson, who prepared a Psychiatric Review Technique assessment on behalf of the State on 10/4/2013, and that the ALJ did not account for all of Dr. Hutson's opinions.  The argument fails.

Dr. Hutson prepared a Psychiatric Review Technique assessment in October 2013.  He opined that Johnson had mild restriction of activities of daily living, moderate difficulties maintaining social functioning, and mild difficulties maintaining concentration, persistence, or pace. He further opined that Johnson had moderate difficulties maintaining attention and concentration for extended periods, working in coordination with or proximity to others without being distracted by them, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without distracting them or exhibiting behavioral extremes, and responding appropriately to changes in the work place. Hutson noted that Johnson was distracted by people and may have some difficulty with attention and concentration; would benefit from limited social demands; has some difficulty coping with work conflict and demands; has been able to adapt in the past in a low stress work setting; and could understand and follow instructions.  He also noted that Johnson had taken college courses in 2013.

The ALJ states that he considered the "State evaluation" and in the following sentence refers to Dr. Hutson. Tr. 62 (fourth paragraph).  The ALJ also noted evidence that is inconsistent with the doctor's opinions, such as that Johnson made the non-credible claim in her adult function report that she was in a "totally paralyzing" state of depression, notwithstanding that she was working as an office cleaner; that Johnson attended college as recently as 2013; and that the record contains unremarkable mental status exams.  Tr. 62 (fourth, fifth, and sixth paragraphs)

and Tr. 63 (first paragraph). Summarizing, the ALJ stated that he "[gave] the State assessments significant weight," but then stated that Johnson's "socialization limitation had been addressed in the" RFC finding, and that he (the ALJ) did "not find, given the unremarkable mental status examinations in the record, that [Johnson] would have any more than mild concentration, persistence, and pace restrictions." Tr. 63 (first paragraph).

Johnson argues that the ALJ should have given significant weight to Dr. Hutson's opinion that she needed a low stress work setting, required a socially isolated job, and would be limited in her ability to respond appropriately to changes in the work setting, and further argues that the ALJ should have expressly stated why he did not give those opinions significant weight. Doc. 18, pp. 18-19. Johnson states that the RFC's limitation of no intense personal relationships does not account for Dr. Hutson's opinions. However, an RFC finding is based on all of the relevant evidence, including medical records, observations of treating physicians and others, and a claimant's own description of her limitations, and need not be based on a specific medical opinion. *Perks v. Astrue*, 687 F.3d 1086 (8th Cir. 2012). Moreover, an arguable deficiency in opinion writing technique is not grounds for reversal when that deficiency has no bearing on the outcome. *Robinson v. Sullivan,* 956 F.2d 836, 841 (8th Cir. 1992). As discussed above, Dr. Zia, Johnson's psychiatrist, found in May 2014 that her memory was intact, and that she had fair judgment and insight, and logical thought processes. In June 2014, Johnson told her counselor that she needed disability because she could not work around a lot of people. At the March 2015 hearing before the ALJ, Johnson testified that she could not work full time due to physical limitations and did not identify mental limitations that prevented her from working full time. Even Dr. Hutson opined that Johnson could follow and understand instructions, and would have no more than mild difficulties maintaining concentration, persistence, or pace. The ALJ's decision that Johnson must avoid jobs involving intense personal relationships is supported by substantial evidence on the whole record. Any failure of the ALJ to more specifically and expressly address the reasons

why he did not give more weight to all parts of Dr. Hutson's opinion does not change the outcome.

### d. The Single Decision Maker

Johnson also argues that reversal is necessary because the ALJ improperly relied on the opinion of the Single Decision Maker. The argument fails.

In the same section of the decision discussing Dr. Hutson's opinion, the ALJ noted that a Single Decision Maker had restricted Johnson to medium exertional-level work because of prior cardiac issues, but the ALJ also notes that Johnson's "medical condition was…stable" and she "did not have pain or limitations due to" cardiac impairment. Tr. 62 (sixth paragraph). In the following paragraph of the same section of the decision, the ALJ stated that he gave the "State assessments significant weight[.]" Tr. 63 (first paragraph). The ALJ then states that he "agree[s]" Johnson's condition is not disabling, but that he would limit her to light work, given the imaging of her cervical and lumbar spine, and cardiac history. *Id.* Continuing, the ALJ stated that Johnson's "socialization limitation had been addressed in" the RFC finding, and that he did "not find, given the unremarkable mental status examinations in the record, that [Johnson] would have any more than mild concentration, persistence, and pace restrictions." *Id.*

As Johnson points out, and the Commissioner does not dispute, a Single Decision Maker is a lay person and not an acceptable medical source, so his or her opinion cannot be given any weight. *Dewey v. Astrue,* 509 F.3d 447, 449 (8th Cir. 2007); 20 C .F.R. §§ 404.1527(a)(2) and 416.927(a)(2). If an ALJ relies on such an opinion and there is no other medical evidence in the record to support the ALJ's determination of the RFC, then reversal may be warranted. *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001).

Reversal is not warranted here. Notwithstanding the ALJ's reference to the Single Decision Maker's opinion about medium exertion in one paragraph, and statement in the

following paragraph that he would give the "State assessments significant weight," it does not appear that the ALJ actually gave the Single Decision Maker's decision significant weight, let alone relied on it in any way, in making the RFC determination. The ALJ assessed a light-work limitation; stated that Johnson's socialization limitation (no intense personal relationships) had already been addressed; and then found that Johnson had no more than mild restrictions in concentration, persistence, and pace, which was part of Dr. Hutson's opinion. As discussed more extensively above, substantial evidence on the whole record including medical evidence supports the RFC determination. Under the circumstances, reversal is not necessary because the Court concludes that notwithstanding the ALJ's reference to the Single Decision Maker, Johnson did not suffer any prejudice.

### 2. Function-by-function analysis

Johnson further argues that reversal is necessary because the ALJ did not expressly perform a function-by-function analysis with respect to her ability to lift, walk, stand, push, and pull at the light exertional level. Doc. 18, p. 13 (citing SSR 96-8p, ¶ 4). However, the lack of an explicit function-by-function analysis does not require remand where the "ALJ's analysis . . . affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous." *Cichocki v. Astrue*, 729 F.3d 172, 177 (2nd Cir. 2013). *See also Samons v. Astrue,* 497 F.3d 813, 821-22 (8th Cir. 2007) (an ALJ's failure to address a question that should have been addressed does not mandate reversal; reversal is necessary only if the failure prejudices the claimant), and *Robinson v. Sullivan,* 956 F.2d 836, 841 (8th Cir. 1992) (an arguable deficiency in opinion writing technique is not grounds for reversal when that deficiency had no bearing on the outcome). The ALJ expressly considered Johnson's reports that her pain was no more than intermittent, negative findings on physical exam by her physicians, her work history including

that at the time of the hearing she was working part-time doing office cleaning, that she did not take narcotic medication for pain, and that she was able to perform a full range of daily activities. Tr. 60-61. The ALJ also expressly considered the expert opinion of Dr. Danushkodi, the physical medicine and rehabilitation specialist. Tr. 62. The doctor's findings on physical exam were largely normal, and she expressly opined that Johnson could lift 20 pounds and had no sitting restrictions. Furthermore, Johnson stated in her Adult Function Report that she could walk a half mile and was trying to build up her stamina, and that she retired from her job at the auto auction because of a negative manager. The ALJ's decision that Johnson could perform light work is supported by substantial evidence on the whole record, such that additional analysis would be unnecessary.

### 3. Consideration of hip pain and ischemic heart disease

Johnson also argues that in determining RFC, the ALJ failed to consider hip pain and ischemic heart disease. It is an ALJ's responsibility to review the evidence as a whole, resolve any inconsistencies, and make an RFC determination that reflects a claimant's credible limitations. *Roberts v. Apfel,* 222 F.3d 466, 469 (8th Cir. 2000). As discussed above, the ALJ considered Johnson's complaints of pain and, giving her the benefit of the doubt, limited her to light work to account for any physical limitations relating to pain. Tr. 62. Johnson identified no symptoms or limitations at all related to ischemic heart disease, but the ALJ noted that the light work limitation would account for any residual effects of her cardiac history. Tr. 63. Johnson's argument therefore fails.

### 4. Findings regarding Johnson's ability to do past relevant work

Finally, Johnson argues that reversal is necessary because in finding that she could perform previous work as a "final inspector," the ALJ identified the wrong kind of "final

inspector." The Court concludes that reversal and remand is warranted with respect to this argument.

The Vocational Expert attended Johnson's hearing before the ALJ and heard Johnson testify that she had worked at an auto auction, first in vehicle registration, then as a driver, and then in the security department. Tr. 73. The VE also testified that she had reviewed the vocational exhibits. Tr. 80. Johnson's Work History Report, dated 9/15/2013 and in evidence as Exhibit 3E, includes Johnson's description of her job in vehicle registration: "mostly registering vehicles for sale—doing thorough vehicle inspection + also authorizing vehicles/people on/off property." Tr. 214. She further stated that the job involved walking, standing, sitting, climbing, stooping, kneeling, crouching, crawling, handling and grasping, and writing, typing, or handling small objects. She also stated that the job involved lifting ten pounds at the most, and frequently lifting less than ten pounds, and that she had no supervisory responsibilities. *Id.*

The ALJ asked the VE to classify Johnson's previous work experience, and the VE identified: (1) security guard, DOT number 372.667-038; (2) driver, DOT number 913.663-018; and (3) "final inspector," DOT number "806.687-018," "light." Tr. 81. In classifying the third job, the VE specifically testified that the job she was referring to was "automobile inspector at the auto auction." *Id.* The ALJ then asked the VE a hypothetical question about a person of Johnson's age, education, and work experience, who could do light work, and stand and walk five to six hours out of an eight-hour day, but must avoid intense personal relationships. The VE testified that the person could perform only the "final inspector" job. Tr. 82. The VE also stated that her opinions were consistent with the Dictionary of Occupational Titles. Tr. 80. The ALJ accordingly found that Johnson could perform her prior work as a "final inspector, [DOT number] 806.687-018" and that such work did not require the performance of work beyond Johnson's RFC. Tr. 63. The ALJ did not proceed to make any alternative findings at Step 5

about Johnson's ability to perform any other kind of work existing in significant numbers in the economy.

Generally, if a claimant can perform her past relevant work, either as she performed it or as the work is performed in the national economy, then she is not considered disabled. 20 C.F.R. § 404.1520(a)(4). Johnson states, and the Commissioner does not dispute, that DOT number "806.687-018" for "final inspector" cited by the VE in her testimony, and the ALJ cited in his decision, is the DOT number for a final inspector who works in an auto manufacturing setting. Job number 806.687-018, "Final Inspector (auto. mfg.)[,] alternate titles: checker," is described in the DOT as follows:

> Inspects completed motor vehicle for conformance to specifications: Examines vehicle for installation of specified accessories, such as radio, heater, and defroster. Tests operation of windows, doors, lights, and controls on instrument panel. Examines seats, headlining, and door paneling for spots or tears in upholstery, and car exterior for chips and scratches on painted surfaces. Records defects on checklist. May inspect components of vehicle and be designated Chassis Inspector (auto. mfg.); Trim Inspector (auto. mfg.).

http://www.occupationalinfo.org/80/806687018.html. The parties do not disagree that the DOT job number 806.687-018 is classified as light exertional level, within Johnson's RFC determination.

As Johnson points out, the vehicle registration job as she performed it at the auto auction is different than the job the VE identified by DOT number, in that Johnson was responsible for "authorizing vehicles/people on/off" the property. DOT number 806.687-018 does not include such job duties. On the other hand, the VE expressly stated that in classifying Johnson's past work, she was classifying a final inspector at the auto auction. The ALJ then asked a hypothetical question, properly phrased in terms of Johnson's background, who could do light

work, and stand and walk five to six hours out of an eight-hour day, but must avoid intense personal relationships.

Generally, where a hypothetical question precisely sets forth all of a claimant's physical and mental impairments, a vocational expert's testimony constitutes substantial evidence supporting the ALJ's decision. *Robson v. Astrue,* 526 F.3d 389, 392 (8th Cir. 2008). Furthermore, an ALJ may find a claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as she actually performed it, or as generally required by employers in the national economy. *Samons v. Astrue*, 497 F.3d 813, 821–22 (8th Cir. 2007) (citing *Martin v. Sullivan,* 901 F.2d 650, 653 (8th Cir. 1990)); 20 C.F.R. § 404.1560(b)(2).

The problem in the case before this Court is that the record, including the VE's testimony and the ALJ's decision, are simply too unclear to conclude that Johnson has not been prejudiced by the reference to DOT job number 806.687-018. The VE explicitly testified that she was referring to the job of final inspector at an auto auction, but also explicitly gave the DOT number of a final inspector job in auto manufacturing. Although Johnson provided a short description in her work history report about how she actually performed the job, which included some kind of interaction with people, there was no other evidence about what the interaction involved, and the DOT job that the VE identified did not include duties involving interactions with people. Moreover, the VE did not explain whether she was classifying the job as actually performed by Johnson, or as generally performed. The ALJ also broadly stated that Johnson's past relevant work as a final inspector, DOT number 806.687-018, was within Johnson's RFC, but did not explain how. Because the record and the ALJ's decision are unclear, the Court is left in the position of trying to connect the dots, and deciding whether those connections matter. Under the

circumstances, the Court cannot conclude that the ALJ's citation of DOT job number 806.687-018 does not reflect a  prejudicial error.

Accordingly, the decision is reversed and remanded for further proceedings consistent with this Order, to clarify Johnson's ability to perform past relevant work at Step 4 and, if appropriate and necessary to resolution of the application, to make a determination at Step 5.

## III.     Conclusion

The Commissioner's decision is reversed and the case is remanded for further proceedings consistent with this Order.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  July 7, 2017
Jefferson City, Missouri